120 So.2d 397

**Lewis Lloyd ANDERSON**

v.

**STATE.**

**2 Div. 16.**

Court of Appeals of Alabama.

Nov. 10, 1959.

Rehearing Denied Dec. 1, 1960.

from the date the judgment by default was rendered and not the date of the execution of the writ of inquiry."

Fred D. Gray, Montgomery, and Peter A. Hall and Orzell Billingsley, Jr., Birmingham, for appellant.

. MacDonald Gallion, Atty. Gen., and David W. Clark, Asst. Atty. Gen., for the State.

CATES, Judge.

Anderson has appealed his conviction of first degree manslaughter. The verdict also carried ten years' imprisonment.

The first principal point relates to the sufficiency of the evidence, and whether two witnesses were competent to testify as to the speed of an automobile.

A second question is grounded on the allegation that, in Dallas County, Alabama, there was, at the time of indictment (January 29, 1959) and the time of trial (February 27, 1959), a systematic exclusion of Negroes from juries with a consequent denial to Anderson, a Negro, of the equal protection of the law guaranteed him under the State Constitution and under the Fourteenth Amendment to the Constitution of the United States.

Viewed from the verdict (as we must take the facts on appeal, Jones v. State, 33 Ala.App. 451, 34 So.2d 483), the case made by the prosecution was as follows:

On January 20, 1959, prosecution witnesses saw Anderson driving a car along Minter Street in Selma headed east. His speed was between sixty and seventy miles per hour.[1]

Minter was an unpaved street in a well populated residential neighborhood. The defendant testified the weather was "damp" and that Minter "is a somewhat of a bad street most of the time but whenever it rains it is a somewhat of a deplorable condition for driving."

When Anderson got to the corner of Church Street, he ran into the front bumper and hood of a green Chevrolet headed north on Church, which had stopped on the south edge of the intersection. The impact spun the Chevrolet to its right 180 degrees from its first heading.

Forward momentum took Anderson's car down Minter Street. It swung first to the right (i. e., to the south side of the street), then caromed to the left off some stone blocks on the north edge of the carriage-

1. One witness judged that Anderson's speed was about sixty or seventy miles per hour; another stated he was traveling pretty fast; a third, the driver of the Chevrolet, said sixty-five or seventy. The speed limit at the collision corner was fifteen miles per hour.

way. As it began to swing again to the right, it hit Tom Reese who was walking across (or had just crossed) the street and had got at least beyond the middle of the left lane of traffic.[2] The car carried Reese along on its hood for several feet, then after he fell off, it ran over him, all the while swerving again to the right or south side of the street. Then back in the road again, it went on to the end of the block where it hit a tree, bounced four feet in the air and turned over.

Reese had both arms and his left leg broken, an open wound ran around his abdomen from his right side and his intestines were outside.

Anderson was indicted for second degree murder. The true bill acted also as a charge of voluntary and involuntary manslaughter.

The defense was to the effect that Anderson had driven all along Minter Street at a moderate speed. He testified he was crossing Church Street at fifteen miles per hour when the Chevrolet driven by Mike Howard came at him. He recalled no more of the happening.

Anderson's physician testified the wreck had caused traumatic retrograde amnesia. The defense implied Anderson probably pressed on the accelerator while he was unconscious.

The State's showing Anderson's driving at high speed on a damp unpaved (and seemingly slick surfaced) street in a well populated area, hitting and running over a pedestrian in the left lane of travel, and the circumstance of the distance of some 396 feet his car went forward after an apparently violent collision, together with the force of its bounce when it hit the tree, made out a prima facie case of that appreciated disregard of the results of wanton conduct from which death ensues, which is one definition of voluntary manslaughter.

■ ■ *Intent to kill is but an alternative ingredient:* the same state of mind can be imputed from conduct wanton and reckless toward human life. The likelihood of another's being imperiled by the wanton conduct, no less than actual knowledge, makes for culpability, thus supplying mens rea in voluntary manslaughter. Rainey v. State, 245 Ala. 458, 17 So.2d 687; Gills v. State, 35 Ala.App. 119, 45 So.2d 44. "Wantonness may be predicated upon conduct occurring before a discovery of the peril. * * *" Lawson, J., in Buchanan v. Vaughn, 260 Ala. 482, 71 So.2d 56, 57.

Anderson has cited a number of civil and criminal decisions for the proposition that, for a killing to be first degree manslaughter, where there is no direct evidence that the act was done wilfully, the State must show it was done with consciousness that injury would probably result from the act, and such knowledge cannot be implied from the knowledge of danger, rather there must be a "design" to do wrong, or a reckless indifference or disregard of natural consequences of the act done. We have carefully considered these cases and have noted discussions of them in decisions as late as Nixon v. State, 268 Ala. 101, 105 So.2d 349 (a murder case), and Smith v. State, ante, p. ——, 109 So.2d 853.

We have concluded that the Rainey case, supra, is still the law and represents a reexamination and a refinement in the law of manslaughter, and one which this court and the lower court are constrained to follow.

Moreover, we consider the Rainey case to be the natural and correct corollary of the principles theretofore developed as to what may evidence intent in voluntary manslaughter. The two following quotations, we believe, will illustrate this development:

"It is insisted on motion for new trial that there is no evidence of an in-

---

2. L. B. Hunter, an eyewitness, said Reese was on the north edge of the roadway alongside the footpath. He further testified the force took Reese out of his shoes.

tent to kill, and, in the absence of such evidence, the defendant cannot be convicted of manslaughter in the first degree. The law governing homicide is not so narrow. If a person knowingly and consciously drives a high-powered automobile at an excessive rate of speed along the public highway, where other vehicles and pedestrians are liable to be and the driver's vision is obstructed by clouds of dust and the sun is shining in his face, and at a point where he must pass a road machine which takes up at least half the road and death results to a pedestrian walking along the highway, a jury would be justified in finding that the offense was manslaughter in the first degree * * *"—Reynolds v. State, 24 Ala.App. 249, 134 So. 815, 817.

"Without an intent to kill there can be no murder, or manslaughter in the first degree. (Citing case.) It is not required that there be a positive or specific intent to kill to constitute manslaughter in the first degree. (Citing cases.) This for the reason that where an accused's conduct or act of violence which ordinarily in the usual course of events would result in death or great bodily harm to another, and a death does result, the accused must be deemed to intend the probable results of such act, i. e., that he intended to kill. * * *"—Smith v. State, supra [109 So.2d 855].

The statement in the Rainey case has been expressly quoted with approval in the following criminal appeals: Clayton v. State, 36 Ala.App. 175, 54 So.2d 719 (pistol killing); Harris v. State, 36 Ala. App. 620, 61 So.2d 769 (automobile manslaughter); Hanby v. State, 39 Ala.App. 392, 101 So.2d 553 (automobile manslaughter).

■ Whether or not a motorist has amnesia when striking a pedestrian is ordinarily not a matter to be determined by his testimony alone; rather it is a jury question. People v. Henry, 23 Cal.App.2d 155, 72 P.2d 915. So that, while certain defense witnesses may not have seen Anderson steering his car, the testimony of State witnesses that they did see him, coupled with the presumption of continuity arising from the undisputed fact that he was the driver at the time of the collision, made out a jury question.

■ Had there been a both-to-blame collision, Reese's death could be laid to Anderson. The cause and effect question under the theory of the defense could still have supported the verdict had the jury chosen to believe that Anderson was driving sixty to seventy miles per hour. Howard's contributory negligence would not absolve Anderson. Hanby v. State, 39 Ala.App. 392, 101 So.2d 553.

Therefore, we consider that, as a matter of law, the trial judge properly overruled Anderson's motion (made when the State rested) to exclude the evidence. After both sides rested, the defense took no exception to the oral charge, nor did it move for any charge affirmative as to either first or second degree manslaughter. The trial judge charged murder out, both in writing and in his oral direction.

The State produced two witnesses, Frank L. DuBose and Peter Wolff, who were standing on the corner of Minter and Mabry and saw Anderson driving "pretty fast," and that he ran into a stopped car, zigzagged across the street, and hit a tree and turned over. Neither witness noticed the car striking Reese.

Both at the trial and on appeal, a great deal has been made of the lack of testimonial qualifications of these witnesses as competent to express judgment on the speed of Anderson's car. The State brought out that the witnesses had ridden in automobiles. Although neither of them could drive, each had watched speedometers while riding and had seen traffic along city

streets. Excerpts from their testimony appear below.[3]

The rule of our decisions is that the speed of an accustomed object is a subject largely of common observation rather than reserved for expert opinion.

■ As stated in Vredenburgh Saw Mill Co. v. Black, 251 Ala. 302, 37 So.2d 212, 218:

"It is well settled that the average witness does not have to have expert knowledge to testify to the speed of a vehicle in ordinary or common use. The fact that the witness McKinley had never driven a truck or automobile did not disqualify him from giving testimony as to the speed of the truck. The credibility of the testimony was for the jury."

See also Williams v. Roche Undertaking Co., 255 Ala. 56, 49 So.2d 902.

■ We consider whatever deficiencies existed in the testimony of these two witnesses were matters of weight and credibility rather than competency.

A further question arose by way of objection to the testimony of the coroner of Dallas County who was not a physician.

The objection went to his expressing an opinion as to whether or not the wounds suffered by Reese probably caused his death.

■ The State brought out that the coroner had observed some seventy-five or more bodies of persons killed by being struck by automobiles. Whether or not this was sufficient qualification is largely addressed to the sound discretion of the trial judge. In view of the full description of Reese's injuries, we need not go into whether or not the admission of the coroner's testimony over objection was an abuse of the trial judge's discretion, for the circumstances and description of Reese's being hit by Anderson's automobile and the details of his injuries constituted sufficient undisputed evidence from which the jury could have reasonably inferred that the collision caused his death. This result could have been reached without expert testimony.

In Eubanks v. State of Louisiana, 356 U.S. 584, 78 S.Ct. 970, 972, 2 L.Ed.2d 991, Mr. Justice Black's opinion begins:

"In an unbroken line of cases stretching back almost 80 years this Court has held that a criminal defendant is denied the equal protection

3. DuBose on direct: "Q. And how was he traveling? A. He was going pretty fast. Q. What kind of car? Was he in a car, or what? A. He was in a car. Q. A car. You know how to drive a car, don't you? A. No, sir. Q. You have been riding in cars, have you not? A. Taxis. Q. Taxis. And you have noticed the speedometer and things of that nature, didn't you? A. Yes, sir. Q. And can you estimate from your knowledge of automobiles and riding in them, can you estimate the speed an automobile is traveling? A. Riding I can. Riding in them, I mean. Q. When you look at an automobile and see it traveling can you from your knowledge of the speed of cars, can you estimate the approximate speed that car is traveling when you see it go by? A. Yes, sir."

Wolff on direct: "Q. Did you ever look at the speedometer to see how fast they were going? A. Yes, sir. Q. How long have you been riding in cars? A. I couldn't really tell you. Q. Well, all

your life so far as you know? A. Yes, sir. Q. And you have always paid attention to speedometers, have you? A. Yes, sir. * * * Q. Did you watch him when he went by you? A. Yes, sir. Q. Do you have an opinion as to how fast he was driving? Attorney Hall: We object. There is no proper predicate laid. He is not qualified. The Court: I overrule the objection. He is not asking how fast; but he wants to know if you have an opinion. Overruled. Attorney Hall: We except. The Court: Read the question. (Thereupon, the Reporter read the last question propounded to the witness.) Q. Do you have an opinion, yes or no. A. No, I don't. Q. You did see the car? A. Sixty or seventy. Q. Did you watch him go on down the road until this wreck took place? A. Yes. Q. At the time the accident occurred with the green car, was he driving approximately the same rate of speed when he hit that car as when he passed by you? A. Yes, sir."

of the laws as guaranteed by the Fourteenth Amendment if he is indicted by a grand jury or tried by a petit jury from which members of his race have been excluded because of their race. * * *"

Appended to this statement is a footnote which contains a number of decisions theretofore rendered by the Supreme Court of the United States on the question. Three of them, in which Texas was the respondent (Smith v. State of Texas, 311 U.S. 128, 61 S.Ct. 164, 85 L.Ed. 84; Hill v. State of Texas, 316 U.S. 400, 62 S.Ct. 1159, 86 L.Ed. 1559; Cassell v. State of Texas, 339 U.S. 282, 70 S.Ct. 629, 94 L. Ed. 839), provide a reasonably good cross section of systems that have been scrutinized.

In this case we are confronted with what is charged to be a scheme in Dallas County, Alabama, to systematically exclude Negroes from juries, both on grand and petit juries solely because of their being Negroes.

Anderson moved (1) to quash the indictment, (2) to quash the petit jury venire, and (3) to declare void the composition of the jury sworn to try him.

We begin our enquiry by taking notice of the opinion of Mr. Justice Foster, then supernumerary, in Fikes v. State, 263 Ala. 89, 81 So.2d 303, 309, reversed on another ground, 352 U.S. 191, 77 S.Ct. 281, 1 L. Ed.2d 246.

We refer to the Fikes opinion for two reasons. First, to call attention to the fact that the jury commission of Dallas county made up a new roll of jurors in October, 1953, so that no exclusion before that date would have any relevancy here. Second, we consider the opinion for the following finding as to the make up of the jury roll in October of 1953:

"* * * The commission put into the box and on the roll in October 1953 fifteen hundred names of which two hundred and fifty to three hundred

were Negroes, and from which the venire was drawn which furnished the grand jury and petit juries here involved. There was nothing on the roll or cards which indicated their race. * * *"

The revision of the jury roll required to be made by statute every year consists primarily of adding names of men newly qualified, and the deletion of those who have died, become disqualified, or come under a statutory exemption. So that the annual book or roll carries over a great many names from a prior year. Therefore, we feel warranted in approaching this question in a case tried some five years after the Fikes trial in relying upon the finding of our Supreme Court in that case as an established foundation.

Moreover, the movant in such a situation carries the burden of proof to adduce enough substantial evidence to reasonably satisfy the trial judge of the existence of a scheme to exclude.

We begin (also referring to the Fikes opinion) with some of our jury statutes.

Code 1940, T. 30, § 21, as amended, gives the basic qualifications of jurors: (1) Sex: male; (2) age: 21–65; (3) general: generally reputed to be honest and intelligent * * * and esteemed in the community for their integrity, good character and sound judgment; (4) specific exclusions: (a) under age; (b) habitual drunkard; (c) afflicted with permanent disease or physical weakness rendering him unfit; (d) cannot read English—except freeholder or householder; (e) *ever* convicted of an offense involving moral turpitude. Note: This disqualification is not confined to felons nor to misdemeanants: "offense" includes breaches of ordinances where the substance of the charge involves moral turpitude. Cf. Beasley v. State, 39 Ala.App. 182, 96 So.2d 693 (adultery).

Code 1940, T. 30, § 24, requires the jury commission to seek out men so qualified and put their names on the jury roll and in the jury box.

Code 1940, T. 30, § 28, requires the commission to note disqualifications or exemptions opposite the names of those theretofore on the roll.

Code 1940, T. 30, § 3, as amended, exempts: (1) Judges; (2) attorneys; (3) officers of the United States; (4) officers of the executive department of the state government; (5) sheriffs; (6) deputies; (7) clerks of the courts; (8) county commissioners; (9) physicians; (10) dentists; (11) pharmacists; (12) optometrists; (13) teachers; (14) actuaries; (15) engineers of boats; (16) bus drivers (under Public Service Commission); (17) truck drivers (under Public Service Commission); (18) railroad engineers; (19) firemen; (20) conductors; (21) train dispatchers; (22) bus dispatchers; (23) railroad station agents; (24) telegraph operators; (25) newspaper reporters; (26) embalmers; (27) radio broadcasting engineers and announcers; (28) superintendents, physicians, and regular employees of Bryce and Searcy Hospitals; (29) officers and enlisted men of the national guard and naval militia; (30) and convict and prison guards.

Moreover, the jury commissioners have discretion to exclude men who would be subject to challenge either by statute or by common law for general grounds (aside from those arising from the peculiarities of a given suit, e. g., consanguinity or being a witness).

The statutory grounds of challenge which should keep a man's name from the roll are (Code 1940, T. 30, § 55, as amended):

"1. That the person has not been a resident householder or freeholder of the county for the last preceding year.

"2. That he is not a citizen of Alabama.

\* \* \* \* \* \*

"5. That he has been convicted of a felony.

\* \* \* \* \* \*

"8. That he is under twenty-one, or over sixty-five years of age.

"9. That he is of unsound mind."

In Brown v. Woolverton, 219 Ala. 112, 121 So. 404, 406, 64 A.L.R. 640, we find:

"\* \* \* The common-law grounds as far as applicable to our system and not changed by statute remain for our guidance. Our statute has added certain grounds of challenge for cause, but they are not exclusive of the common law remaining unchanged. \* \*"

Pardon of an infamous offense does not remove the ground for challenge. Brown v. Crashaw, 2 Bulstr. 154; Terry v. State, 25 Ala.App. 135, 148 So. 157, holds that a pardon will not cut off enquiry as to a witness's conviction of a crime involving moral turpitude. See also Mason v. State, 39 Ala.App. 1, 103 So.2d 337, affirmed 267 Ala. 507, 103 So.2d 341.

When drawing a venire either for a grand or petit jury, the circuit judge pulls "without selection," i. e., blindly, cards with the jurors' names for the venire list to be summoned by the sheriff. The names of those who appear and are not excused from grand jury duty are drawn in open court from a hat or box. The first eighteen men so picked are the grand jury. Code 1940, T. 30, §§ 30 and 38.

Our statutes require that the cards that go into the jury wheel or box be white, all of the same size and texture. The only writing is the name, occupation, residence and place of business. Code 1940, T. 30, § 20, as amended.

It should be pointed out that no evidence is shown of any violation of any of these or related statutes.

First, Anderson adduced the testimony of the circuit solicitor who had been in office since August, 1954, and who attended the organization of grand juries in Dallas County twice a year. No Negroes had served on grand juries during that time. He had met court in Dallas County four times a year. Each and every venire from which both grand and petit jurors were selected contained a number of Negroes.

The solicitor recalled one case in which all of the Negroes on the venire requested the judge to excuse them. These excuses were granted, with the consequence that their withdrawal left no names of Negroes on the list.

On other occasions when grand juries were drawn, there were Negroes still left on the venire and their names were placed in the hat from which the grand jury was drawn.

Each venire contained an average maximum of seven or eight Negroes, with the normal total of the venire being around seventy summoned, less those who were not found by the sheriff.

On the present venire there were a number of Negroes, one of whom claimed exemption for over age; another, named Tom Waller, was drawn but had to be excused because of an attack; a third was excused on account of illness; and two more were left on.

The circuit clerk was called as a witness, and on cross-examination stated that Negroes had been drawn every session of court since she began as clerk. She further testified that there was nothing on the cards drawn from the jury box to show whether the juror was black or white.

The secretary of the jury commission testified her duties were to type up the jury roll as it was given to her, type up the jury cards, write the commission minutes, and post the venire to the jury roll. She had no contact with the venire at all. The jurors were just names to her and there was no way to ascertain from their employment or addresses, so far as she knew, as to their being black or white. Asked if she knew whether or not Negroes served on any grand jury since she went into her position in September, 1954, her answer was, "Not that I know of." However, it was not brought out that she had knowledge of who did or did not serve on grand juries.

The deputy solicitor was put on the stand and testified that he had been solicitor for "as many as ten, fifteen or twenty" years. During that period of time, he had known of a Negro *serving* once or twice in Dallas County. He stated that none had served in the last three years, including the grand jury which indicted Anderson. On cross-examination he stated that in approximately 1953 or the early part of 1954 there was a Negro who served on the jury at that time.

Anderson took the stand to show that he was a citizen of the city of Selma, Dallas County, Alabama, in the United States.

William H. Dinkins testified he had been a resident of Dallas County since 1894, except when he was in school and in the army. He attended Selma University and Brown University, from which he obtained a B. A. degree. Columbia University conferred upon him a Master of Arts degree. He was a member of Phi Beta Kappa.

Dinkins had never been convicted of any crime in Dallas County, and had never served a penal term in Dallas County. When asked if he had any personal knowledge of any Negroes serving on a jury in Dallas County, he answered, "I don't know anything about grand juries." He was then asked whether he knew of any Negro who had served on the grand jury in Dallas County, to which he answered, "No, sir." A like question as to petit juries was asked, to which he replied, "No." He further testified that he had never served on a grand or petit jury in Dallas County, nor had he had any occasion of being excused from serving on a venire.

On cross-examination it was brought out that Dinkins was, at the time of the hearing, over age as a juror, aged sixty-eight and a half, and prior to that time had been a school teacher, hence exempt from jury duty under § 3, as amended, supra, at least while teaching.

The solicitor brought out that Dinkins did not know whether a Negro had ever served on the grand jury or not. Dinkins added, "I don't know anything about it."

On redirect examination, Dinkins was furnished a jury list for the February 23, 1959, term of criminal court which contained some sixty-eight names. No question pertinent to the issue raised by the motion was asked Dinkins with respect to this list.

Henry Sylvester Lawson had worked as a mechanic at a cotton seed oil mill and retired. He testified he had never served on a grand jury, but that he had served on a jury in a city court some ten or fifteen years ago. However, further questioning brought out that rather than being a juror, he was in that court in the capacity of a witness.

Lawson did not know any Negroes who had *served* on juries in Dallas County, and he "had just heard tell of some being called but they didn't serve."

John Brown had been summoned for Federal jury duty, but had never served on a State court jury, either petit or grand. When asked if he knew of any Negro who had served on such juries, he answered, "I can't remember. In fact, I haven't been around in court too much."

On examination by the court, it was brought out that Brown did not know whether Negroes had served on juries or not. The Federal venire on which Brown had been called consisted of thirty men, of whom two were Negroes. Brown did not serve on any panel.

The defendant then called the chairman of the jury commission who had been in office since April, 1954. He testified he had participated in preparing the jury rolls in Dallas County, had interviewed prospective jurors, and with the other two members of the commission met and decided when to add names to the list. He had never counted the number on the list. He gave as his estimate that one in ten jurors on the list was a Negro. The total number on the list he guessed at being around 1800.[4] He did not know of the composition of grand juries and petit juries.

In making up the list the chairman of the commission went about to different parts of the county, and where he knew "good men" he asked them about others, and the other commissioners apparently followed the same method. Then the names are entered on the list or roll and each name corresponds with a card that goes in the jury box.

The commissioners interviewed both white and Negro prospective jurors. Not all commissioners went into all precincts; nor did a commissioner, in visiting a precinct, attempt to visit every man over twenty-one years of age; rather the commissioners sought recommendations of persons known to them to be of good standing in each community.

It was brought out on cross-examination that the cards sent by the jury commission to go in the jury box to be drawn by the judge were all similar except for the name of each juror.

L. R. Harrison, a minister, pastor of Mt. Averett Baptist Church and of the True Vine Baptist Church, who had finished his schooling some three years before, testified that he knew of none of the members of his congregation in Dallas County who had served as jurors; nor had he ever served as a juror, nor been excused from jury service. He had not been convicted of a felony or crime involving moral turpitude, and did not drink or gamble. Furthermore, his father, who was also a minister, had never served as a juror in Dallas County.

James Black, who made his living by logging and owned timber land, testified he was forty-nine years of age; had never been convicted of a felony in Dallas County; had never served a term for more than a year in jail; had never been convicted of anything and given "that term" and given probation; was not an habitual drunkard; did not gamble; had not been arrested for gambling or loitering; could read and write English fairly good; had never served as a

4. In the Fikes case the ratio seemed to be 1 in 5.

**520**

juror; had never been called to serve as a juror; did not know of any of his friends who had ever served on a grand or petit jury; nor had he personally been asked to be excused from so serving.

Black had no ailment or crippling disease that might have prevented him from so serving. He was a Mason. He did not know of any members of his lodge who had served as jurors, including the then Master.

On cross-examination Black testified he had never made an effort to find out anything about whether Negroes served on juries or not. He had never checked the list of jurors in Selma newspapers to see if any Negroes were on it. He did not know Roosevelt Dawson. He did know Tom Waller, who ran a dry cleaning plant, but he did not know that Waller had been subpoenaed for jury duty that week. He knew Percy Huckabee, but he did not know that Huckabee had been subpoenaed for jury duty that week. He did not know Young Childers, a farmer, nor did he know Bennie Phillips, who had apparently also been called.

A stipulation was made that the 1950 Federal census showed 6940 white males and 7956 colored males over the age of twenty-one years in Dallas County.

The State then put Terrell Hicks, assistant cashier of a Selma bank, who had served on a grand jury in January, 1954, on the stand. He recalled a Negro by the name of Roosevelt Dawson had served on that grand jury. On cross-examination he stated that he had no personal knowledge of any Negroes serving on a grand or petit jury thereafter. On redirect it was brought out that he had made no attempt to find out about grand juries other than the one on which he served.

The State then produced the sheriff who had held that office since November 8, 1955. We excerpt from his testimony:

"Q. Since November 8, 1955, have you ever served subpoenas when there was not negroes on the jury? A. Not to my knowledge.

\*   \*   \*   \*   \*   \*

"Q. Since November 8, 1955, when you became Sheriff, state the approximate percentage in your best knowledge have been negroes, negro prisoners and white prisoners?

"Attorney Gray: We object, unless he shows the age.

"Q. Over twenty-one years old? A. I will say it has been above eighty-five per cent negro.

"Q. And that includes all crimes? A. All crimes.

"Q. That leaves approximately fifteen per cent that are white. Are most of them Dallas Countians? A. No. I would say a large percentage of them is from Chilton County and some from Craig Air Force Base."

On cross-examination:

"Q. When you testified a moment ago as to the percentage of arrests you have made since you became Sheriff, you meant eighty-five per cent of the total number of arrests you have made have been negroes? A. That is an estimate. They have been.

"Q. Would you say a large number of negroes you arrest are repeaters? A. To some extent, yes.

"Q. What percentage would you say? A. Well, it would be hard to say. I never tried to arrive at it.

"Q. Using the same judgment you used in arriving at the percentage of negroes, would you give your best judgment of the number who are repeats? A. I would say about the same percentage, number of negroes are repeats as the whites are repeats.

\*   \*   \*   \*   \*   \*

"Q. So you are not saying eighty-five per cent of the total negro population are criminals? Are you not saying they are? A. No; I am not."

Glenn H. Defke, Chairman of the Jury Commission, was recalled and testified:

"Q. Do you know of your own knowledge how many people at Martin's Station precinct, where you lived so long, are on the jury roll? A. I do know, yes, sir.

"Q. Is that the only one you absolutely know? A. Yes. That is the only one I am positive on.

"Q. How many people in that precinct are on the jury roll? A. Seven.

"Q. How many negroes? A. Four.

"Q. The other three are whites? A. That is right.

\* \* \* \* \* \*

"Q. Captain, what is the policy of your Commission as to white preachers and white teachers, negro preachers and negro teachers? A. To leave them out of the jury box. If there has ever been one put in, it was an oversight.

"Q. On the list we have now was one man W. David Holloway, Plantersville, and it shows 'Preacher & Teacher', did you know of your own knowledge when he was put on the list whether he was a preacher and teacher? A. No, sir, I did not.

"Q. And is it your policy to leave them both out? A. Yes.

"Q. Of both races? A. Yes."

On cross-examination:

"Q. Have you talked to negroes in Selma about prospective jurors? A. I have."

Lt. P. L. Pyron, City of Selma Police Department, deposed:

"Q. What is the percentage of the arrests that are colored and what are white? A. Well,—

\* \* \* \* \* \*

"Q. Answer the question. A. I would say seventy-five to eighty per cent are negroes."

On cross-examination:

"Q. Are most of the persons you referred to in the seventy-five per cent persons who committed misdemeanors or felonies? A. That includes all arrests, felonies, misdemeanors, and also traffic.

"Q. Would you say traffic violations were a larger portion of that seventy-five per cent? A. Well, I would say fifteen or twenty per cent probably would be traffic.

"Q. And it also includes other petty crimes, classified as misdemeanors, does it not? A. That includes all the arrests."

The clause of the Fourteenth Amendment, § 1, which we consider here, reads:

"\* \* \* No State shall \* \* \* deny to any person within its jurisdiction the equal protection of the laws."

█ The first and most obvious observation on this prohibition is that the denial must be by an action of the State and that this State action does not embrace denials which work discriminations which are purely private in nature.[5]

With this in mind, we review some of the decisions of the Supreme Court of the United States to find what actions by the States in particular cases were considered to have operated to exclude persons from jury service because of their race or color.

In Strauder v. State of West Virginia, 1879, 100 U.S. 303, 25 L.Ed. 664, judgment was reversed because the West Virginia jury statute provided "all white male persons who are twenty-one years \* \* \* shall be liable to serve as jurors."

---

5. State Action, 1 Race Relations Law Reporter 613. "Private" acts sanctioned by a State are not before us. See comment

34 N.Y.U.L.Rev. 152, and Horowitz, Misleading Search for "State Action," 30 So. Cal.L.Rev. 208.

In Neal v. Delaware, 1880, 103 U.S. 370, 26 L.Ed. 567, the petitioner in error claimed that the Levy Court which acted as a jury commission purposefully excluded all Negroes from its consideration. This allegation was stipulated to have the effect of evidence. Cf. Hale v. Commonwealth of Kentucky, infra.

Gibson v. State of Mississippi, 1896, 162 U.S. 565, 16 S.Ct. 904, 40 L.Ed. 1075, was an affirmance of the Supreme Court of Mississippi. It was held that no discrimination was shown to justify removal to the Federal court. Cf. State of Virginia v. Rives, 1876, 100 U.S. 313, 25 L.Ed. 667.

Carter v. State of Texas, 1900, 177 U.S. 442, 20 S.Ct. 687, 44 L.Ed. 839, appears to be a procedural decision, in that a motion to quash the indictment was held not to be too late when addressed to the question of exclusion of Negroes from the grand jury. Cf. Michel v. State of Louisiana, 350 U.S. 91, 76 S.Ct. 158, 100 L.Ed. 83, and Reece v. State of Georgia, 350 U.S. 85, 76 S.Ct. 167, 100 L.Ed. 77.

In Rogers v. State of Alabama, 1904, 192 U.S. 226, 24 S.Ct. 257, 48 L.Ed. 417 (reversing judgment under an unpublished opinion, Ala.Sup.Ct., filed July 10, 1903), there was a motion to quash the indictment because the jury commissioners excluded from the grand juror list all colored persons. This decision, too, is a procedural one, inasmuch as the State moved in the trial court to strike the motion to quash, and the motion to quash was stricken from the files.

The Supreme Court of the United States, in effect, said that the motion to quash, though prolix, sufficed to raise the Federal question. It would appear from this case and from the Neal opinion that a mere allegation in conclusionary form is sufficient and the quo modo of the exclusion need not be pinpointed by a defendant.

In Martin v. State of Texas, 1906, 200 U.S. 316, 26 S.Ct. 338, 50 L.Ed. 497, the motion to quash the indictment because of exclusion of Negroes from the grand jury was overruled in the trial court. The State had taken issue, but Martin adduced no evidence in support of his motion. The court, per Mr. Justice Harlan, said:

> " * * * The trial court, it must be assumed from the record, had nothing before it, when deciding the motions to quash, except the written motions and the written answers thereto. * * * (200 U.S. at page 319, 26 S.Ct. at page 339)

> " * * * The absence of any such proof from the record in this case is fatal to the charge of the accused that his rights under the 14th Amendment were violated." 200 U.S. at page 321, 26 S.Ct. at page 339.

Later cases cite Martin for the proposition that the defendant bears the burden of proof.

Norris v. State of Alabama, 1935, 294 U.S. 587, 55 S.Ct. 579, 79 L.Ed. 1074, reversing 229 Ala. 226, 156 So. 556. On the motion to quash the indictment returned by the grand jury to the Jackson County Circuit Court, Norris adduced evidence which tended to show that no Negroes had been called for jury service in that county in a long number of years. The books containing the jury roll were produced in court and there was a dispute touching entries therein as to the genuineness of the listing of names of six Negroes. This misprision, the Alabama Supreme Court implied, was the responsibility of the clerk of the board of jury supervisors. The Supreme Court of the United States considered Norris made out a prima facie case that there were qualified Negroes in the county, and that the State had failed to overcome this showing of an exclusion.

Hale v. Commonwealth of Kentucky, 1938, 303 U.S. 613, 58 S.Ct. 753, 82 L.Ed. 1050, reversing 269 Ky. 743, 108 S.W.2d 716. Hale's motion offered to prove that there were 8,000 Negroes in a population of 48,000, with 700 Negroes on the tax as-

sessor's books as compared to 6,000 white persons. The jury wheel had 500 to 600 names, all of white citizens. Upon the Attorney General's stipulating that the motion could be taken as evidence, it was held that the Commonwealth had failed to overcome the prima facie showing of exclusion arising from the absence of the names of Negroes in the jury wheel.

Pierre v. State of Louisiana, 1939, 306 U.S. 354, 59 S.Ct. 536, 83 L.Ed. 757, reversing 189 La. 764, 180 So. 630. Pierre moved to quash the indictment and the general venire from which both grand and petit juries came. The parish population included at least one-third Negroes. The trial judge sustained the motion to quash the petit jury panel and venire, but denied as to the grand jury, taking the view that the indictment was not evidence of guilt.[6] Under the applicable Louisiana procedure, the jury commissioners pick the names of twenty qualified citizens. From these twenty the judge selects a grand jury foreman and the sheriff draws eleven more. From 1896 to 1936 no Negroes were ever selected by the commissioners.

The petit jury venire for December, 1936, contained the names of three Negroes out of some 300. One of these Negroes was dead, one was misnamed, and one was called for service in 1937. The population of St. John the Baptist Parish was twenty-five to fifty per cent Negro. The court, per Black, J., held that the quashal of the petit jury venire and panel imported evidence sufficient to quash the indictment, and also that the operation of the system of selection made a prima facie showing (unrebutted) that Negroes were systematically excluded from grand juries.

Smith v. State of Texas, 1940, 311 U.S. 128, 61 S.Ct. 164, 165, 85 L.Ed. 84, reversing 140 Tex.Cr.R. 565, 136 S.W.2d 842. Three thousand Negroes met the statutory qualifications for grand jurors. Between 1931 and 1938 only 5 of 384 grand jurors were Negroes. This disparity came from the commissioners putting Negroes last on the list of sixteen names where it was a uniform custom for the court to pick the first twelve names as the grand jury.

The court, per Black, J., remarked.

"Here, the Texas statutory scheme is not in itself unfair; it is capable of being carried out with no racial discrimination whatsoever. But by reason of the wide discretion permissible in the various steps of the plan, it is equally capable of being applied in such a manner as practically to proscribe any group thought by the law's administrators to be undesirable. And from the record before us the conclusion is inescapable that it is the latter application that has prevailed in Harris County. Chance and accident alone could hardly have brought about the listing for grand jury service of so few negroes from among the thousands shown by the undisputed evidence to possess the legal qualifications for jury service. Nor could chance and accident have been responsible for the combination of circumstances under which a negro's name, when listed at all, almost invariably appeared as number 16, and under which number 16 was never called for service unless it proved impossible to obtain the required jurors from the first 15 names on the list."

Hill v. State of Texas, 1942, 316 U.S. 400, 62 S.Ct. 1159, 86 L.Ed. 1559, reversing 144 Tex.Cr.R. 415, 157 S.W.2d 369. Like Neal and Martin this is a case hinging on the quantum of proof. After showing there were over 55,000 Negroes in Dallas County, Hill was considered by the Supreme Court to have made a prima facie case of exclusion even after allowing for ineligibility.

No Negro had ever been summoned in some twenty or more years. The jury

6. Cf. Rives, J., in United States ex rel. Goldsby v. Harpole, 5 Cir., 263 F.2d 71, citing Jackson, J., dissenting in Cassell v. State of Texas, infra.

commissioners claimed lack of personal acquaintance.

The court, per Stone, C. J., rejoined (316 U.S. at page 404, 62 S.Ct. at page 1161):

"* * * The jury commissioners, although the matter was discussed by them, consciously omitted to place the name of any negro on the jury list. They made no effort to ascertain whether there were within the county members of the colored race qualified to serve as jurors, and if so who they were. * * * Discrimination can arise from the action of commissioners who exclude all negroes whom they do not know to be qualified and who neither know nor seek to learn whether there are in fact any qualified to serve. In such a case discrimination necessarily results where there are qualified negroes available for jury service. * *, * "

Akins v. State of Texas, 1945, 325 U.S. 398, 65 S.Ct. 1276, 1278, 89 L.Ed. 1692, affirming 148 Tex.Cr.R. 523, 182 S.W.2d 723. Akins sought to quash the indictment because of an "alleged purposeful limitation on racial representation." Under the Texas practice shown, the trial judge appoints grand jury commissioners who select a list of sixteen persons from which twelve are chosen by the judge.

In this case the commissioners interviewed and chose only one Negro. This Negro the judge empaneled.

This case must be read with Cassell v. State of Texas, infra. In Akins there was a change shown from former complete exclusion. However, this change had not been practiced long enough for a statistical pattern negativing chance to have emerged.

Patton v. State of Mississippi, 1947, 332 U.S. 463, 68 S.Ct. 184, 92 L.Ed. 76, reversing 201 Miss. 410, 29 So.2d 96. There was evidence that for thirty years no Negroes had appeared on a jury. It appears that the Mississippi statute, unlike the Alabama statute, requires that a juror also be an elector. Negroes were shown to be registered poll tax paying voters. No evidence explained their absence from the venires. Cf. United States ex rel. Goldsby v. Harpole, supra, note 6.

Cassell v. State of Texas, 1950, 339 U.S. 282, 70 S.Ct. 629, 632, 94 L.Ed. 839, reversing 154 Tex.Cr.R. 648, 216 S.W.2d 813. Testimony showed that the jury commissioners of Dallas County, Texas, had taken the affirmance of Akins v. State of Texas, supra, to mean that the inclusion of one Negro, no more and no less, did not mark indictment of a Negro by a grand jury so composed as denying equal protection. The majority opinion considered the commissioners were under a duty to familiarize themselves with the eligible jurors. In view of the size of the population of Dallas County, it was assumed that a large proportion of the Negroes were eligible. The majority said proportional limitation is no more permissible than is proportional representation mandatory. There must be "neither inclusion nor exclusion because of race."

In Avery v. State of Georgia, 1953, 345 U.S. 559, 73 S.Ct. 891, 97 L.Ed. 1244, there was a drawing from a jury box containing white and yellow tickets. The white tickets were for members of the white race and the yellow for Negroes. This system was held to be prima facie evidence of discrimination, and it mattered not that the judge who drew the tickets in no way chose between white and yellow.

Brown v. Allen (Speller v. Allen, Daniels v. Allen), 1953, 344 U.S. 443, 73 S.Ct. 397, 417, 97 L.Ed. 469. (Habeas corpus denied to examine North Carolina sentences after exhaustion of State procedure.)

In the Brown case confinement of the selection of jurors for grand and petit juries to taxpayers in Forsyth County was held not to be discriminatory per se.

In the Speller case the fact that there were dots on scrolls bearing the names of

Negroes was held to be immaterial. "The jury box was produced in court, opened, and counsel for defendant permitted to examine the scrolls." The selection of the venire was made by a child's drawing the names from the box. The court, in referring to the undisputed prior exclusion, stated (344 U.S. at page 479, 73 S.Ct. at page 418):

" * * * Former errors cannot invalidate future trials. * * *"

Hernandez v. State of Texas, 1954, 347 U.S. 475, 74 S.Ct. 667, 671, 98 L.Ed. 866, reversing 160 Tex.Cr.R. 72, 251 S.W.2d 531. A motion to quash the indictment and the jury panel because of the systematic exclusion of persons of Mexican descent from (a) jury commissioners, (b) grand jurors, and (c) petit jurors. The court, per Warren, C. J., referred to the pattern of proof in Norris v. State of Alabama, supra, and described this as the "rule of exclusion," which the State had not explained as due to circumstance or chance.

Reece v. State of Georgia, 1955, 350 U.S. 85, 76 S.Ct. 167, 100 L.Ed. 77, reversing 211 Ga. 339, 85 S.E.2d 773, is a preliminary procedure case companion to Michel v. State of Louisiana, supra, and turns more on the due process clause for decision, although the question raised in the court below, which was overruled for procedural reasons, was one coming under a charge of systematic exclusion of Negroes from the grand jury. The ratio decidendi of this case affords no precedent here.

In Eubanks v. State of Louisiana, 1958, 356 U.S. 584, 78 S.Ct. 970, 2 L.Ed.2d 991, reversing 232 La. 289, 94 So.2d 262, there was a motion to quash the indictment because of the systematic exclusion of Negroes from the grand jury in Orleans Parish. The system of selection resembled that in Pierre v. State of Louisiana, supra, in that a jury commission selects the names of not less than 750 persons competent to serve as jurors. From this list the com-

mission semi-annually draws the names of seventy-five persons. A judge of the criminal court picks a twelve-man grand jury from these seventy-five. The court said (356 U.S. at page 586, 78 S.Ct. at page 972):

" * * * Obviously the judges have broad discretion in selecting from the list * * * Several of them interview a substantial number of prospective jurors before making their choice. Others, including the judge who chose the jury that tried petitioner, testified that they usually selected on the basis of personal knowledge or reputation in the community. Petitioner does not challenge this system of choosing grand jurors, as such, but he does contend that it has been administered by the local judges so that * * * (Negroes) have been systematically excluded * * *"

The court continued (356 U.S. at page 587, 78 S.Ct. at page 973):

" * * * We are reluctantly forced to conclude that the uniform and long-continued exclusion of Negroes from grand juries shown by this record cannot be attributed to chance, to accident, or to the fact that no sufficiently qualified Negroes have ever been included in the list submitted to the various local judges. * * *"

An analysis of the statutory method of picking jurors shows that the Alabama statutory scheme compares most nearly to that shown in the North Carolina case of Speller v. Allen, supra.

We have here no question of statutory exclusion, directly or indirectly. We do not require jurors, even those who cannot read or write English, to be property owners. We do not require jurors to be registered voters.

However, our statutes and decisions are replete with qualitative standards to bar·

those convicted of various felonies, misdemeanors and municipal offenses. The jury statutes probably also confer far too many occupational exemptions.[7]

The only opportunities, under the Alabama statute, for a system of exclusion to operate would be either in (a) fraudulent drawings from the jury box for the venire or from the hat (or box) in picking a grand jury panel, or (b) a deliberate wilful passing over all qualified Negroes in making up the original list.

It is noteworthy in this case that Anderson did not, as did Norris in Norris v. State of Alabama, supra, make any attempt to produce the jury rolls in open court so that they might be examined for the presence or absence of Negroes.

Indeed, the State's evidence undisputedly showed that there were Negroes on the jury rolls. There was uncontroverted testimony that each venire contained an average maximum of seven to eight Negroes.

■ In noncapital criminal cases, it is within the province of the trial judge to excuse jurors from service on petit juries (Draper v. State, 250 Ala. 679, 36 So.2d 73), and the same rule obtains in the selection of grand juries.

■ That in the last five years Negroes have, in many instances, asked to be excused from jury service in Dallas County, is not a showing of any action on the part of the State of Alabama or any of its officials to exclude them from juries.

■ The record does not show how the State and the defendant chose to exercise the strikes as to the array for the petit jury. See Code 1940, T. 30, § 60, as to striking jurors in noncapital criminal cases; § 64, capital cases. If this were to have been made a point upon appeal, the record could and should have been required so to show. Vernon v. State, 245 Ala. 633, 636, 18 So.2d 388.

Unlike Texas or Louisiana, the members of a grand jury are not selected vis-a-vis any official of the State other than upon their first going upon the roll. Our trial judge, after hearing requests for excuses, has the names of all the veniremen placed in a hat or box and then proceeds to draw names.

No allegation is made in this case that there was any form of selection other than by lot. There was nothing such as white and yellow cards or "marked decks," so that no question arises as to the drawing of the venire or of the grand jurors from the hat or box. This results then in leaving open as the only point of enquiry whether or not the jury commissioners have any system or scheme for excluding Negroes from the rolls.

■ We consider the trial judge did not abuse the discretion confided in him and came to a reasonable conclusion based on substantial evidence. Among our reasons for so believing are:

■ 1. The trial judge was entitled to take judicial knowledge of the size of the jury roll, which was testified to comprise some 1800 names, from his acquaintance therewith in drawing from the jury wheel or box for the various venires. This knowledge also was available to him from the published opinion of our Supreme Court in the Fikes case in which it was pointed out that of some 1500 names on the jury list at that time 250 to 300 were of Negroes.

■ 2. The trial judge was entitled to take judicial knowledge of the existence of the names of Negroes on the jury roll from the fact that Negroes appeared on the venires attending the court in substantial numbers.

3. That the ratio of white jurors to Negro jurors should be greater than in proportion to the ratio of white men to Negro men because of, among other pertinent factors, the undisputed evidence of a

7. Jones, Trial by Jury in Alabama, 8 Ala.L.Rev. 274.

greater number of arrests of Negroes by the law enforcement officers of Dallas County and the city of Selma. Even with an allowance for repeaters, substantially more (and out of population proportion) of the persons arrested were Negroes.

4. The trial judge was entitled to consider from his own knowledge as presiding judge over trials of felonies and misdemeanors as to the proportion of persons convicted as between white and Negro defendants, a matter on which no evidence was offered by either side.

5. The trial judge was entitled to take into consideration the failure of Anderson to establish any coercion or inducement on the part of any state, county, or local official or of any conduct condoned by them which would cause Negroes to seek to excuse themselves from jury duty in Dallas County, Alabama.

6. The trial judge was entitled to take into consideration the failure of Anderson to ask for the production of the jury rolls themselves for examination in open court. The Alabama law generally prefers as evidence where possible that which admits of less argument and dispute, and the jury rolls themselves would have afforded a much more authoritative solution than is given by hearsay and repute.[8]

We feel all and all in balance that Anderson has failed to carry the burden of proof that there is any scheme within the meaning of the equal protection clause of the Fourteenth Amendment which excludes or limits the number of Negroes available for jury service in Dallas County, Alabama.

Accordingly, the judgment below is due to be

Affirmed.

8. Shepherd v. Sartain, 185 Ala. 439, 64 So. 57; Code 1940, T. 30, § 20, as amended, last sentence; State ex rel. Denson v.

Miller, 204 Ala. 234, 85 So. 700; Norris v. State of Alabama, supra.