THE PEOPLE OF PUERTO RICO, Plaintiff and Appellee, v. CARLOS NOEL ORTIZ MORALES, Defendant and Appellant.

No. 16893. Decided November 14, 1962.

Santiago Polanco Abréu and Luis H. Rivera Torres for appellant. J. B. Fernández Badillo, Solicitor General, and Héctor R. Orlandi Gómez, Assistant Solicitor General, for The People.

Division composed of Mr. Justice Belaval, as Chief Judge of Division, Mr. Justice Hernández Matos, and Mr. Justice Santana Becerra.

MR. JUSTICE SANTANA BECERRA delivered the opinion of the Court.

Appellant was found guilty of involuntary manslaughter under an information charging that on a certain occasion he operated a motor vehicle with such negligence, carelessness, and lack of circumspection, at excessive speed, without taking into consideration the conditions and width of the road, that he ran over Luis Tomás Arce with said vehicle. The accident occurred about 1:30 p.m. of October 29, 1959 and Arce died about three hours later. A motion for a new trial based on newly discovered evidence was denied. On appeal, he assigns as errors committed by the trial court: (1) the refusal to grant a new trial; (2) finding him guilty without sufficient evidence; and (3) in defining the offense of involuntary manslaughter in the instructions to the jury.

Let us consider next the second error assigned. The People did not state any theory. Its first witness was the physician who performed the autopsy. The victim presented erosions or scratches on the right frontal part of the head and on the region of the right ear; also small erosions on the right elbow and on the back of that hand. There was another erosion with hematoma about three inches wide and two inches long on the right inguinal region of the abdomen. On his back there was a small transversal incised wound

about one inch long in the medial part of the waist. The left shoulder presented a large erosion and wounds in the left hand and forearm. The thoracic cavity did not present injuries. In the posterior region there was a rupture of the left kidney with large hemorrhage around the bladder. He had a hematoma on the left region of the coccygeal bones and fracture of the iliac bone at the joint with the femur with profuse hemorrhage in that region. The cranial cavity did not present bone fractures, but a general meningeal hemorrhage in the encephalic mass. The cause of the death was the injury to the brain caused by trauma to the brain. The physician testified that the rupture of the kidney is only caused by a very violent blow; a slight blow usually does not rupture a kidney.

The second witness for The People was Cándida Soltrén. She testified that she was returning from work and stopped on the side of the road near the house of Hermenegildo Román; that the victim was walking along the right-hand side of the road; she did not know whether he was walking on the pavement, and the car involved in the accident was traveling in the same direction; there were two persons, a man and a woman, and they stepped out to carry the victim to the car. She did not know whether the horn of the car sounded; the vehicle was traveling "fast," at great speed; that in her opinion the car hit the victim "on the side," pointing, according to the record, to the waist, on the left side; that when she arrived Hermenegildo Román was there, and she helped put the victim's feet in defendant's car, and that the police arrived as the car was about to start. When the car hit the victim, the defendant kept going and backed out; the car stopped "about 10 to 15 feet away" more or less from the scene of the impact. Defendant did not say anything; he was squalid, pale. This witness testified that the road is wide at that place and is divided by a white line. She did not notice if there were any speed signs. It was not raining, the day was bright, the road conditions were good; there was no other car

around there, nor any obstacle, nor persons, nor anything. On cross-examination she testified that she had lived in that ward for about eleven years; that the boy (the victim) and his family lived back of her house; that she knew him from his birth and saw him grow up and that they were neighbors; that she was about 30 or 35 feet away from the scene of the accident; that she heard the blow and the car hit him throwing him toward the pasture and kept going; that it stopped about 10 or 15 feet away and turned back to pick him up. She kept looking and went over to the place as they were placing him in the car and helped accommodate his feet. At that moment no cars passed by the place. There was no one around there. When she arrived Hermenegildo Román was placing him in the car; that when she drew near Hermenegildo and defendant had already put him in the car and she said: "Heavens, it's Luis Tomás," and helped accommodate his feet. She was there when the police arrived, but she did not stay to inform on the occurrence. She went to tell the family. She testified in the district attorney's office in the evening of the same day of the accident.

After Cándida Soltrén testified The People offered the testimony of Hermenegildo Román. He testified that when the accident occurred he was sitting in a hammock in the parlor of his house, barefooted and in an undershirt. He heard a car as if coming in the direction from Isabela to Aguadilla; he heard the impact hitting hard on something. When he heard the impact he went out running and a man and a woman had already stepped out of the car; he noticed a man lying on the grass away from the road, and the man (referring to defendant) yelled to him to hurry up and help him put the man in the car. He helped place the victim on the seat, and the police arrived after the car had already left with the victim for the hospital. There was no one around and he was the first to arrive. The victim's body was on the grass on the side of the road about 25 feet away from the car. The witness' house is about 30 to 40 meters away

from the side of the road. The standing car was about 50, 60, or 70 feet away from the house. When he heard the impact he dashed out running to the place, did not put on anything, he left in an undershirt and barefooted. When the police arrived the car had already left with the victim and people began to gather. When asked if he recalled if the car had sounded the horn, he said that he did not hear anything; that he heard the screech and the impact; that it was a tremendous blow, too big. On cross-examination the witness denied categorically that Mrs. Soltrén witnessed the accident.[1]

The third and last prosecution witness was police officer Otilio Serrano. He was patrolling the traffic together with another policeman. On the road between Aguadilla and Isabela he saw in the opposite direction a standing car picking up an injured person. They stopped and defendant explained what had happened and they let him proceed to the hospital. Defendant admitted that he was operating the vehicle and had run over the victim. The witness testified that there was a lady, a dark-skinned young woman at the place, and that more people kept coming. He noticed brake marks on the road. They measured a distance of 25 feet between the place where the injured party was lying and the front wheels. There were blood marks on the grass on the side of the road. Did not notice whether the vehicle had

---

[1] On this point, the record shows: "Q.—I want to ask you a question which I want you to answer specifically...Cándida Soltrén is a lady?... A.—My neighbor in that ward, and the boy was also my neighbor. Q.—Please tell the lady and the gentlemen of the jury if that lady was there at the time of the occurrence. A.—That lady was not there...Q.—Now, I'm asking you if you saw Cándida Soltrén around there. A.—She was not there; there was no one there; the chauffeur and the lady who came in the car were there. Q.—What persons helped put the injured in the car? A.—Well, I helped the chauffeur and she arrived shortly afterwards; she was there then, but when the impact occurred she was not there; there was no one there; she arrived after the accident. Q.—How long after the accident do you figure more or less that she arrived? A.—We had already put him in the car, I then looked back and she was behind me, but she

any visible imperfections. On cross-examination he testified that he did not know how the accident occurred; that when he arrived at the place they were picking up the injured party; that the woman he saw there left with the chauffeur and that he did not recall seeing any other woman around there; that people kept arriving while they put him in; that he did not know whether there were any persons who could have witnessed the accident; that during the investigation they took down the names of the persons who were there; that he remembers the name of a man who was there and later that woman (referring to witnesses Soltrén and Román) who were at the scene of the accident; that she arrived later and told him what she had seen. Upon questioning by the defense, police officer Serrano testified that in the particular place of the occurrence one could drive at the speed authorized by law of as fast as 45 miles per hour. He testified that when he arrived shortly after the accident he did not see any vehicles traveling in the opposite direction or in the same direction; that the road, the military road, is wide at that place.

The evidence for the defense was to the effect that defendant and a lady who accompanied him were working in

was not there at the time of the accident. Q.—Did she help at all put him in the car? A.—Well, I belive she helped with the feet because he had one foot over there and another over here, and she helped put his feet inside the car, but at the time of the occurrence she was not there . . . Q.—So, you assure the court that you did not witness the accident? A.—No, sir, I did not see anything; I only heard the impact. Q.—When you arrived, you did not see this either, Cándida Soltrén? A.—There was no one there."

On further cross-examination by the district attorney, the witness ratified that at the time of the occurrence there was no one there, including himself, and when the district attorney insisted why he dared affirm before the court that witness Soltrén was not there at the time of the accident, the record shows: "Hon. Judge: The question is, if you say that when you heard the impact you were lying in a hammock in your house, how can you tell for sure that that witness was not there at the scene of the accident? The district attorney is asking you, if when you heard the impact you say that you were in your house lying in a hammock, how can you assure the court and the gentlemen of the jury that this lady, Cándida

that zone advertising the "Imperial" butter. They were not selling nor delivering the product at that moment, but getting acquainted with the place and the location or grouping of the houses. The lady testified that everything happened suddenly. The victim was walking on the right-hand side and tried to cross at that moment. They were traveling at a speed of 20 to 25 miles. She saw witness Cándida Soltrén at the place about four or five minutes after the accident. On the way she and defendant talked about the business. On cross-examination she testified that she saw the victim "too close," about three or four and a half feet from the car; that the road is straight at that place. The road could be seen in both directions 500 meters away from the scene of the accident.

Defendant testified that they were going to start their advertising work when the accident occurred. He saw the victim walking in the same direction alongside the road; he never thought that he would try to cross the road so suddenly; that he saw him and sounded the horn as usual, but proceeded because he did not imagine he was going to cross; that when he was very near the car, about 10 or 15 feet away, he does not know whether he got scared or because of the noise of the

---

Soltrén, was not at the scene of the accident? A.—I want to finish explaining; I did not want to say it until now; that lady was in our house talking to us and she stayed in the house talking; when this thing happened that lady was in the house talking to my wife and my mother-in-law;' she was inside." When he was asked why he had not told that to District Attorney Torres during the investigation, the witness said: "I am going to explain that; she was called first and her testimony was rather short, and then when I was called they would not let me finish talking; I could not say anything and I remained silent, but that lady was inside the house. Q.—[District Attorney]: And this is the first time you mention it? A.—Yes, sir, because she insists on saying that she was there and she was not." On examination by the defense, the witness again testified: "Q.—Do you assure the court and the lady and gentlemen of the jury that that is the truth? A.—Yes, sir, that is the truth; I swear before God and before the world that she was up in my house."

Some statements made by Mrs. Soltrén as well as other details of her testimony point to the fact that perhaps this witness was right. However, we will not interfere with the jury's appreciation of the situation.

car, the victim tried to cross and as he swerved to the left he hit him with the front corner of the car and he fell to the side of the pasture land. He testified that he was not watching the speedometer, but figured that he was traveling at a speed of 25 miles per hour. Upon questioning by the district attorney, he said that he first saw the victim about 50 or 100 feet away; that he kept his eyes on the road until the accident occurred. That shortly before he came across a car which he thought was a police car coming from the opposite direction. The road is wide and straight at that place. He figures it was about 8 feet wide between the center line and the edge of the road and that the vehicle was about five feet wide; that he was traveling between the side and the white line; that the victim was on the side, but all of a sudden he crossed to the middle of the road; that he always blows the horn when he sees a person and that he blew it on this occasion; that the victim did not do anything when he heard the horn; that the victim crossed to the left after he sounded the horn; that he was traveling at a regular moderate speed; that the victim crossed very close to the car about 10 or 15 feet away and he hit him as he stopped. In answer to questions on the nature of the blows, he said that a person can be smashed with a car, which is metal, at the rate of 15 miles. Upon receiving the impact the person bent to the right and fell five or six feet away from the side of the road. At the time of the accident they were not stopping at any house; they were inspecting the place where they were going to work. Upon questioning on the probability that the victim might cross all of a sudden, he said that he did not imagine he was going to cross.

 Section 203 of the Penal Code provides that manslaughter is the unlawful killing of a human being without malice, and that it is involuntary when it occurs in the commission of an unlawful act not amounting to felony, or in the commission of a lawful act which might produce death, in an unlawful manner or without due caution and circumspection. According to § 11 of that Code, in every crime or public

offense there must exist a union or joint operation of act and intent or criminal *negligence*. According to § 559 of the Penal Code the word *negligence* imports a want of such attention to the nature or probable consequences of the act or omission as a prudent man ordinarily bestowes, in acting in his own concern. The Automobile and Traffic Act in force at the time of the occurrence provided that the speed of a motor vehicle would be regulated with due care, and with due regard to the *width, amount of traffic, use* and *conditions* of the highway, and that no person could drive at a speed higher than that which may permit him to exercise due control of the vehicle and to reduce the speed, or to stop when necessary in order to avoid knocking down a person, etc.

[5] The evidence for defendant tended to show that the accident was due to the fact that the victim attempted to cross the road all of a sudden at a short distance away from the front of the car, without being able to avoid knocking him down despite the fact that it came to a stop. In its instructions the court charged the jury as follows: "There is no question that defendant may plead as defense the victim's negligence, and there is no question also that if defendant alleges and proves its existence, or that if such negligence is evident from the prosecution evidence, it may be taken into consideration for the purpose of mitigating defendant's responsibility. However, in order that such negligence may constitute a complete justification and totally exonerate the accused from responsibility, it must be of such a nature as to convey to the mind of the trier that such negligence, *more than contributory*, was the *sole* cause of the accident."

██ The foregoing instruction was a correct statement of the prevailing doctrine. We stated the principle in those same words in *People* v. *Francis*, 19 P.R.R. 659, 665. We have repeated it in more or less the same terms in *People* v. *Guadalupe*, 62 P.R.R. 252; *People* v. *Rivera*, 65 P.R.R. 299, 302; *People* v. *Andino*, 78 P.R.R. 744, 749. And see *State* v. *Romero*, 69 N.W. 187, 365 P.2d 58, 60; *Coate* v. *State*, 306

S.W.2d 727, 729 (Tex.) ; *Anderson* v. *State*, 120 So.2d 397, 401 (Ala.) ; *Commonwealth* v. *Root*, 156 A.2d 895, 899 (Pa.) ; *People* v. *Hoe*, 330 P.2d 907, 912 (Cal.). The rule was necessary in order to prevent confusion between the field of the criminal responsibility and the principle—already repudiated to a great extent in the field of civil responsibility —that an aggrieved party's contributory negligence completely exonerated the wrongdoer, no matter how culpably the latter has also acted. However, the foregoing principle is not incompatible with this other classical principle in the criminal field, nor precludes its application: presumption of innocence which, under constitutional authority, we have held must be enjoyed by every accused in a criminal prosecution.[2] This juridical abstraction takes shape and practical reality through the principle of law that the guilt of every accused shall be proved beyond reasonable and founded doubt, and that if there is reasonable doubt he should be acquitted. Consequently, where the evidence for The People in a criminal prosecution is not so insufficient as to warrant a peremptory acquittal as a matter of law, an accused is bound to offer only such evidence as will raise in the mind of the trier a reasonable doubt as to his guilt. If he succeeds in raising such doubt, the law orders his acquittal. *Everett* v. *State*, 356 P.2d 394, 397 (Ariz.) ; *Davis* v. *State*, 112 So.2d 353, 354 (Ala.) ; *Commonwealth* v. *Bonomo*, 151 A.2d 441, 445 (Pa.) ; *State* v. *Brennan*, 88 N.E.2d 281, 284 (Ohio) ; *State* v. *Walker*, 166 A.2d 567, 574 (N.J.) ; *State* v. *Larrabee*, 161 A.2d 855, 859 (Me.) ; *State* v. *Hubbard*, 171 S.W.2d 701, 707 (Mo.) ; *cf. People* v. *Túa*, 84 P.R.R. 37, and cases cited in footnote 4.

Although it is true that for the purposes of substantive responsibility under § 203 of the Penal Code for the death of a human being the common negligence without special characteristics is sufficient, as was held in *People* v. *López*, 77

---

[2] Constitution of the Commonwealth, Art. II, § 11.

P.R.R. 573, in a criminal prosecution it is necessary to abide by those norms determinative of such responsibility. Without being in conflict with the principle announced, which excludes as exonerating factor the aggrieved party's contributory negligence, if from the evidence as a whole and other circumstances there should arise some reasonable and founded doubt as to whether the damage was due to defendant's fault or to the victim's negligence, defendant is entitled to the benefit of such doubt.

Under the circumstances surrounding the occurrence, as they appear from the very evidence for The People—the victim walking alongside a wide and straight road, in good conditions, the asphalt dry, a clear day, no vehicles traveling in either direction nor obstacles on the way, no showing or indicia in the evidence that the vehicle abandoned the traveling zone—defendant's version as to the cause of the accident is not so unreal or inconceivable in the light of those circumstances as to justify its complete elimination as being a rational hypothesis of the occurrence, foreclosing every possibility that it could have happened that way, although it was always the jury's function to give it credit or not. Defendant was charged with driving with such negligence, carelessness and lack of circumspection, at excessive speed, without taking into consideration the *conditions* and *width* of the road, that he caused the death. The authorized speed at that place was 45 miles per hour. This does not mean, as we have stated time and again, that the operator exercised due diligence and circumspection and that he was not negligent because of the fact that he did not exceed the permissible limit. Nor do the described conditions of the place, under the surrounding circumstances, show by themselves that traveling at the speed limit permitted by law was negligence.

This case, by its general characteristics, bears great resemblance to that of *People* v. *Pérez*, 79 P.R.R. 460, in which we reversed the judgment of conviction, and it may be said that in certain special aspects, such as the evidence

on the speed, it compares more favorably to defendant. The criteria set forth in the *Pérez* case on a similar situation are fundamentally applicable to the case at bar. Assuming that the jury did not give credit to the evidence for the defense, the prosecution evidence—aside from the manner of resolving the conflict therein as to whether or not the only alleged eyewitness saw the occurrence—is insufficient in the light of the criteria of law set forth in *People* v. *Pérez*, *supra*. Although excessive speed may be established by the consequences of the impact in a collision, as we have said in *People* v. *Rivera*, 69 P.R.R. 500, and *People* v. *Busigó*, 78 P.R.R. 153 (both cases of collision with other objects under § 328 of the Penal Code) the collision of a solid steel and iron object, such as an automobile, with an object of less consistency, such as the human being, necessarily produces violent blows of serious consequences even though there is no excessive or exaggerated speed.

It was necessary to establish defendant's negligence and culpability beyond a reasonable doubt. Reasonable doubt is reasoned doubt, the mental product of ratiocination over all elements of judgment involved. Analyzing all those elements of judgment afforded by the evidence, whether taken as a whole or only the prosecution evidence, with the full credibility which the jury may have given to the latter, in the light of the applicable rule of law we do not believe that The People proved its case, at least beyond a founded doubt.

The judgment of conviction will be reversed and another judgment rendered acquitting defendant.